**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

UNITED STATES OF AMERICA,      :
                                 :
         Plaintiff,        :
                                 :
        v.               :     Case No. 08-20585
                                 :
PETER HENDRICKSON,        :
                                 :
        Defendant.     :

## <u>MOTION OF DEFENDANT PETER E. HENDRICKSON TO VACATE, SET ASIDE OR CORRECT CONVICTION PURSUANT TO 28 U.S.C. §2255</u>

Defendant Peter Hendrickson moves the Court to vacate, set aside or correct his conviction and sentence pursuant to 28 U.S.C. §2255.  Recent government admissions reveal fraud in the prosecution of this case and withheld exculpatory evidence, both of which relate to a broad and deep violation of Mr. Hendrickson's right to confront secured by the Sixth Amendment, and resulted in severe prejudice.  This new evidence also highlights jurisdictional infirmities in the bringing of the charges against Mr. Hendrickson making his conviction invalid. Further, Mr. Hendrickson challenges his conviction on the grounds that he did not enjoy the effective assistance of counsel in trial.

Mr. Hendrickson's direct appeal for reversal of conviction and sentence and judgment of acquittal/dismissal of charges on other grounds is pending. This Motion is not intended to replace or occlude that direct appeal. Rather, this is a *habeas* motion in that Mr. Hendrickson is at this moment enduring imprisonment, and should not be, because he did not enjoy the protection of a fair trial, and due to defects in the trial Court's jurisdiction, as detailed below. His conviction and sentence should be vacated, set aside or corrected and his immediate release from

prison should be ordered for one or more of the reasons given herein.

This Motion is based on the following memorandum of points and authorities, the affidavits of Peter Hendrickson (Exhibit C) and Jack R. Hendrickson, Jr. (Exhibit D), and upon the record in this case.

## MEMORANDUM OF POINTS AND AUTHORITIES

Title 28 of the U.S. Code, §2255 relevantly provides:

(a) A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

(b) Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto. If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or re-sentence him or grant a new trial or correct the sentence as may appear appropriate.

## BRIEF STATEMENT OF THE CASE

In October, 2009, Peter Hendrickson was convicted on charges that his tax return claims of having received nothing qualifying as "wages" as that term is relevantly defined in law in 2000 and 2002-2006 were false, and willfully so. Over Mr. Hendrickson's objection, the trial judge had allowed the government to present to the jury some 739 pages of documents consisting in large part of assertion- and conclusion-laden filings and declarations made by government personnel in a civil lawsuit brought against Mr. Hendrickson and his wife in 2006, along with the summary judgment in the matter, which was issued in favor of the government.

No competent witness took the stand to introduce or answer for a single inculpatory assertion in these documents. Nonetheless, the government proposed, and the trial judge actually instructed, that the jury should take them as reflecting "official views" that Mr. Hendrickson had received "wages" during the years involved (implying that the jury should assume Mr. Hendrickson's conclusions to the contrary to be false), and that exposure to these alleged "official views" must have led Mr. Hendrickson to conclude that he had received "wages" (and therefore his reports to the contrary were "willful").

Only many months after the witness-free use of this material as evidence against Mr. Hendrickson in trial did the judge in the civil case admit the specious reasoning by which she arrived at her judgment (which in any event didn't become final even in the District Court until after all the conduct charged in the indictment); and only months after that did the government admit that it has never had any evidence in support of its allegations in the suit, nor met several statutorily-specified jurisdictional thresholds for bringing the action. These new pieces of evidence inform four of the five issues presented in the following memorandum. The fifth addresses the manifestly ineffective performance of Mr. Hendrickson's trial counsel, who appears to have suffered from a stroke during trial. Each issue presented involves fatal defects in the conviction due to Constitutional violations in the conduct of the trial, fraudulent representations by the government, and a variety of jurisdictional infirmities.

## I.   THE CONVICTION WAS INDUCED BY FRAUD AND THE COURT WAS WITHOUT JURISDICTION TO IMPOSE SUCH SENTENCE

### A.   New Evidence Reveals That Major Elements Of The Prosecution Case Were Fraudulent In Character And Fraudulently Represented To The Jury

#### 1.   The government has never had evidence to support its claims in the civil case used against Mr. Hendrickson in trial.

In papers filed in the civil matter of *United States v. Peter and Doreen Hendrickson*, #2-

06-CV-11753, on October 25, 2010, the government asks the District Court to coerce from Mr. and Mrs. Hendrickson "processable" "amended" tax returns, the contents of which are to be as dictated by the government, as an "equitable remedy" accomplished by injunction. See excerpts of the government's motion attached hereto as Exhibit A.

There are only two reasons for the government to want "processable amended returns" from the Hendricksons containing dictated testimony: 1) Because it lacks any actual evidence on the basis of which the IRS can assess a liability, and wants to use these bogus documents to fill that hole, and 2) It needs to make it appear that the Hendricksons' original returns have been rescinded, because those returns long-since rebutted and nullified the third-party allegations to which the government has resorted as a basis for asserting that the couple owed any tax; that their returns were "false"; and that its lawsuit was proper.

The Hendricksons' actual returns oblige the government to produce additional fact evidence of its own to support these third-party allegations. *See* 26 U.S.C. §6201(d) and §7491, *Mason v. Barnhardt*, 406 F.3d 962 (8th Cir. 2005); *Portillo v. CIR*, 932 F.2d 1128 (5th Cir. 1991); *Rendall v. CIR*, 535 F.3d 1221 (10th Circ., 2008) and cases cited; *Perez v. CIR*, T.C. Summary Opinion 2009-94. The government has to date never produced this required supporting evidence, and consequently the court has lacked jurisdiction over the lawsuit and its rulings are invalid.

Further, the lawsuit was brought under the auspices of 26 U.S.C. §7405(b), which provides for a suit to recover an "erroneous refund of tax," and thus requires the prior establishment of a tax liability against which the refunded amount had been collected in order to confer initial jurisdiction on the District Court. By its October 25, 2010 motion, the government acknowledges that no liability of the Hendricksons for any tax for the years involved in its suit

has ever been established, defined, or even cognizably alleged.  The current Department of Treasury Certificates of Assessment for these years say the same.

The government's motion therefore constitutes an admission that its civil lawsuit was brought in bad faith, making the judgment in that suit invalid and void. The government's use of that judgment and of its own pleadings in that lawsuit as evidence against Mr. Hendrickson in his criminal trial was therefore also in bad faith, and deliberately misleading of his jury.

### 2.    The government has refused to formally assert that Mr. Hendrickson's filings are false or fraudulent, and therefore has brought its charges in bad faith.

The suit against the Hendricksons was also predicated on the claim that the government sincerely and in good faith deemed Mr. and Mrs. Hendricksons' original returns for 2002 and 2003 to be "false or fraudulent" (a claim integral to the criminal charges brought against Mr. Hendrickson, as well).  When the government sincerely believes that filed returns are "false or fraudulent," whether "willfully" so or otherwise, and is in need of "processable returns," it is REQUIRED by statute to produce and sign its own as its remedy, per 26 U.S.C. §6020(b)(1) and (2):

> (1) Authority of Secretary to execute return:
> If any person fails to make any return required by any internal revenue law or regulation made thereunder at the time prescribed therefore, or makes, willfully or otherwise, a false or fraudulent return, the Secretary shall make such return from his own knowledge and from such information as he can obtain through testimony or otherwise.

> (2) Status of returns.
> Any return so made and subscribed by the Secretary shall be prima facie good and sufficient for all legal purposes.

This is not to say that whenever the government imagines itself offended by a filed return, it is obliged to create a return of its own (which reason says is true, since Congress hardly meant for such perceived offenses to be ignored, but which is not the issue here). Rather, it is to point out that *when the government elects to contest* what it alleges is an offensive return, §6020(b) lays

out the manner in which it is authorized to do so. The government is NOT presented with the luxury of choosing between A) one of its officers swearing under penalties of perjury to the sincerity and good-faith of government-serving declarations disputing those sworn-to on a filed return, and B) having citizens compelled on threat of imprisonment to swear to government-dictated declarations, whichever it finds more pleasing or easier to accomplish.  "[T]he purpose of section 6020(b)(1) is to provide the Internal Revenue Service with a mechanism for assessing the civil liability of a taxpayer who has failed to file a return, [or filed what the government deems to be a "false or fraudulent" return]..." *United States v. Lacy*, 658 F.2d 396 (5th Cir. 1981) (citing *United States v. Harrison*, 486 F.2d 1397 (2d Cir. 1972).

In addition to being a breathtaking assault on the rule of law and without any statutory authority, an "equity remedy" such as is sought in the government's fraudulent "lawsuit" is doctrinally improper.  An "equity remedy" can only be pursued by the government and considered by a court when no statutory remedy exists:

> **[A] common-law [suit] "may be entertained only in the absence of a statutory remedy" [and] "where statutory relief is afforded and clearly applies to the circumstances giving rise to the action, the statute constitutes the exclusive avenue for seeking redress."**

*Aarti Hospitality, LLC v. City of Grove City*, 2009 U.S. App LEXIS 20883 (6th Cir. 2009) (emphasis added).

> Our analysis is governed by the well-established principle that, in most contexts, "'**a precisely drawn, detailed statute pre-empts more general remedies**.'" EC Term of Years Trust v. United States, 550 U. S. ___, ___ (2007) (slip op., at 4) (quoting Brown v. GSA, 425 U. S. 820, 834 (1976)).

*Hinck v. United States*, 550 U.S. 501, 127 S.Ct. 2011 (2007), a unanimous Supreme Court tax case ruling citing another unanimous Supreme Court tax case ruling (emphasis added; some internal citations omitted).

The only reason for the government to pursue an invalid "remedy" when a simple, valid

and even required remedy to a legitimate, good-faith need is available is that the "need" here is NOT legitimate, and NOT good-faith, and no government actor is willing to sign returns making assertions contrary to those on the Hendricksons' originals. In short, not only was the government unable to put a single person on the stand in trial to declare Mr. Hendrickson's filing to be false, but it actually hasn't been able to get anyone to dispute his and his wife's original returns under penalties of perjury over all the years since 2003 – even while not hesitating to launch civil and criminal assaults against him. Both efforts have clearly been undertaken in bad faith, and in defiance and default of statutory and common-law jurisdictional requirements.

Further, in addition to its jurisdictional ramifications, this failure has another side, in that it should have been considered by Mr. Hendrickson's jury once the government elected to present civil-case-related material as being inculpatory. It was not, but only because Mr. Hendrickson was denied his right to confront those whose words were presented by the government as accusations against him.

The government's newly-acknowledged evidentiary failures, jurisdictional defects, and fraudulent intentions are favorable to Mr. Hendrickson – being both exculpatory and impeaching of government assertions, and they were suppressed by the prosecutors – either willfully or inadvertently. Confidence in the verdict in Mr. Hendrickson's trial clearly cannot be maintained. Instead, prejudice must be recognized, and a plain violation of *Brady v. Maryland*, 373 U.S. 83 (1963). *In re McDonald*, 514 F.3d 539 (6th Cir., 2007). In light of any one, or any combination, of these violations of Mr. Hendrickson's right to a fair trial and/or jurisdictional defects, his conviction should be vacated.

**B.**   **The Government's Admission Concerning The Civil Case Reveals A Fundamental Defect In The Court's Jurisdiction In Both The Civil And Criminal Actions**

The government has admitted to a jurisdictional defect with its motion of October 25,

2010 in the civil case. Mr. Hendrickson HAS already introduced sworn testimony in a legally-meaningful manner, rebutting all allegations that he engaged in taxable activities, and declaring his conclusions that he owes no tax.  In order to gain jurisdictional traction, the government must present its own legally-significant assertions – that is, sworn attestations made in a manner specified by law – which contradict, and compete with, those sworn to by Mr. Hendrickson.

Lacking such government-made and -sworn returns, or even any sworn testimony in trial, Mr. Hendrickson's returns stand uncontested and uncomplained-of, and have done so throughout all the proceedings in which they have been assailed with much strident rhetoric, but zero legal formality.  No one has asserted a competing claim to his withheld property in the manner authorized by law, and no one has meaningfully alleged that anything on his returns is incorrect. It is too much by far to suggest that Congress has intended, or that the rule of law can tolerate, the state enjoying the luxury of being granted staunchly- and affirmatively-opposed "motions for summary judgment" while being spared having to produce its own sworn testimony in support of its claims or contradicting what is already sworn-to on a prosecution target's merely impugned returns.  Nor can someone like Mr. Hendrickson be made to undergo the gauntlet of trial by the state on accusations of having testified falsely when no one has formally declared his testimony to be false.

The government may not resort to the assertions on W-2s or 1099s, once they have been rebutted. Such assertions are merely third-party allegations in any event, but further, once rebutted they are specifically denied any evidentiary weight per 26 U.S.C. §6201(d) and §7491. This is in complete harmony with 26 U.S.C. §6020(b), which requires that if the target of a tax claim hasn't done so himself, either explicitly or by default, a government officer, at personal risk of perjury prosecution for doing so without good, valid, defensible and independent cause,

must assert an interest on the government's behalf "from his own knowledge and from such information as he can obtain through testimony or otherwise." Congress clearly recognizes that it is hardly proper for a plaintiff – even a government plaintiff – to be granted standing in court for effectively saying nothing more than, "I allege that the Defendant owes me a debt, which I want the Court to enforce – even violently. But I'm not willing to assert this alleged debt under oath."

The government having now exposed its failure to meet this basic (and statutory) jurisdictional threshold, and its failure to make any legally-meaningful averment of a basis for overcoming his presumption of innocence, or even bringing it into question, Mr. Hendrickson's conviction in this case should be vacated.

II.    **THE CONVICTION WAS ACCOMPLISHED AND THE SENTENCE WAS IMPOSED IN VIOLATION OF THE CONSTITUTION OR LAWS OF THE UNITED STATES**

A.    **The Government's October 25, 2010 Motion Reveals Exculpatory Evidence That Would Have Been Heard By Mr. Hendrickson's Jury Had His Right To Confront Not Been Violated.**

1.    **The Admissions By The Government Are Exculpatory.**

The admissions by the government in its October 25, 2010 motion in the civil case against Peter and Doreen Hendrickson clearly constitute exculpatory new evidence in at least three ways. First is the admission that the government has never made formal legal claims against the Hendricksons and established its standing for legal action.  This is despite having had years in which to do so since the Hendricksons made the claims of their own which the government purports to dispute in both the civil case and the criminal charges against Mr. Hendrickson, and even though the Hendricksons have been the objects of intense governmental interest over all that time. This admission would have unquestionably raised doubts in the minds of Mr. Hendrickson's jurors as to the sincerity and legitimacy of the government's complaint in the civil case and its criminal charges in this case.

Second, the government represented to the jury that it was "the IRS view" that Mr. Hendrickson had received "wages" of the sort required to be reported on the forms he filed, but never put anyone on the stand to actually say this under oath, or be questioned about whether this really WAS the "view" of the witness, and if so, why. The admission that no one in the government has ever signed a document declaring and taking personal responsibility for such a view unquestionably raises doubts that anyone in government actually holds it. Perhaps every one of the expressions presented to the jury is really just a mindless transcription or adoption of someone else's "view." Or, if anyone does hold this view, their failure to have signed a document expressing it under oath raises doubts that he or she has any good, defensible reason for doing so.

Third, that no formal government claim has ever been made against the Hendricksons, and that in order to acquire "evidence" to establish what it had claimed to be the basis for its lawsuit, the government finds itself obliged to ask a court to coerce the couple into producing dictated testimony, unquestionably raises doubts about the legitimacy of the government filings and resulting rulings in that lawsuit, or, at the very least, about the significance of those filings and rulings. The same is true of the criminal charges. After all, the government should already have evidence sufficient to support its suit and charges before bringing either. Further, if the government's representations in the civil and criminal cases are true, declarations by the Hendricksons are irrelevant.

### 2.   The Exculpatory New Evidence Implicates A Fatal Constitutional Error In Mr. Hendrickson's Trial.

Mr. Hendrickson's jury was presented with hundreds of pages of documents containing analyses and conclusions, none of which were introduced by competent witnesses able to be questioned, challenged and impeached as to the meaning and significance of those contents. The admissions in the government's October 25, 2010 motion in the civil case now reveal some of

what WOULD have been revealed to Mr. Hendrickson's jury had he not been denied the protection of his right to confront those responsible for these documents, which the government and the trial judge represented as being inculpatory.

The judge and prosecution both told Mr. Hendrickson's jury that these hundreds of pages of documents reflected the "IRS view" that Mr. Hendrickson had received "wages" of the sort required to be reported on the forms he filed. See Trial Transcript, Vol. 2, pp. 267-268; Vol. 3, pp. 435-437 and 490-91. Now it is admitted that no one in the government has ever actually declared this view over his or her own signature. What's more, the government now admits that its interest in having Mr. and Mrs. Hendrickson coerced into declaring this view themselves arises from its need to fill critical evidentiary and jurisdictional holes in its civil and criminal cases.

These admissions clearly put the government's representations in trial in a new light, which should have been shed on them when those representations were made to the jury. But it was not, because Mr. Hendrickson was denied his rightful opportunity to confront anyone over these representations.

Further, these specific admissions now belatedly made by the government are only the tip of the iceberg. Had the government been properly required to put witnesses on the stand to defend and answer for the documentary assertions it was allowed to make, Mr. Hendrickson's jury would also have heard admissions that no assessments of tax on his earnings have ever been made contrary to what appears on his returns for the years involved in the civil case, or any subsequent year, nor any deficiency ever been alleged, nor any lien declared or recorded, nor even a single audit deemed appropriate.  Other exculpatory revelations would doubtless have been forthcoming as well.

The government may well propose its own explanations for all of this, of course, or argue against characterizing these things as "admissions," and so forth. That is its right. But the time and place for such arguments was in trial and in front of Mr. Hendrickson's jury, which has sole authority for determining which explanation is more credible, and deciding whether or not the government's unchallengeable representations that WERE made in trial still appear sincere and persuasive, once subjected to fair challenge.

### 3.    Additional New Exculpatory Evidence.

In addition to the admissions made by the government in its October 25, 2010 motion, the judge in the civil case made admissions exculpatory to Mr. Hendrickson in a hearing she conducted on June 10, 2010, almost eight months after his trial. In this hearing, the first ever conducted in the civil case, Judge Nancy Edmunds revealed that her "summary judgment" in the government's favor was based on the bizarre notion that the Hendricksons' rebuttals of the government's allegations in the suit constituted endorsements of those allegations! See Exhibit B, page 6 of the transcript of the June 10, 2010 hearing.

The prosecution in trial used the civil case ruling to suggest that a careful, fair and properly adversarial, evidence-based judicial process had resulted in a determination that Mr. Hendrickson had received "wages" subject to reporting requirements, and that he must be deemed to be acting in bad faith to say he believes otherwise in the face of this judicial outcome. However, the reality of Judge Edmunds' "*Say nothing and the government wins by default, say something and you lose by 'judicial' construction*" formulation would plainly have raised doubts in the minds of Mr. Hendrickson's jurors as to both of these prosecutorial positions.

All of these admissions and revelations should have been made in the presence of Mr. Hendrickson's jury. They would have been, had those responsible for the prosecution-serving documentary assertions which WERE presented to the jury been made to take the stand before a

single page of these documents was allowed into evidence, as is required under the Confrontation Clause of the Sixth Amendment. See *Crawford v. Washington*, 541 US 36 (2004) and *Melendez-Diaz v. Massachusetts*, 129 S.Ct. 2527 (2009).

There can be no question that confidence in the outcome of Mr. Hendrickson's trial is impossible in the face of even just these revelations in particular, and all the more so in consideration of those not yet revealed due to the pervasive violation of his right to confront his accusers.  Mr. Hendrickson is entitled to the judgment of acquittal that would have resulted had he not been denied his right to be secure against faceless, unchallengable "evidence," and moves this Court to so rule.

**B.      The Government Admissions Concerning The Civil Case Make Clear The Judge Abused His Discretion In Denying Mr. Hendrickson's Motion To Exclude That Case From Use In Trial**

The government's October 25 admission that it lacks sufficient grounds for alleging a tax to be, or ever to have been, due from the Hendricksons for 2002 or 2003 underscores the impropriety of the District Court's ruling denying Mr. Hendrickson's Motion *in Limine* of 9/1/09 (Docket # 57), in which he sought to bar the introduction of this civil case in trial.  Mr. Hendrickson renews his point made in that Motion that in light of the fact that nine of the ten events charged in the criminal case had occurred before this "lawsuit" was even served, and 10 out of 10 had occurred before even a "final ruling" in just the District Court had been rendered, it was completely improper, and hopelessly prejudicial and even fraudulent, to allow it to be suggested to his jury that Mr. Hendrickson should have been influenced in the charged conduct by the outcome of this case. Obviously, it was a temporal impossibility for him to have been so influenced.

Nor could it be anything but manifestly improper to have admitted prosecution discussion of the civil case into this criminal trial – not to mention witnessless documents! –

even by the argument that one of the charged events occurred after the "lawsuit" was served. The mere filing of an action is obviously of no moment whatsoever. The government is perfectly capable of filing actions in error; or abusively, with "speculative" claims while hoping to get lucky; or in outright fraud, as it has now been revealed to have done in this particular case.  As is now dramatically highlighted by the government's October 25 admissions, all mention of the civil case should have been excluded from this trial, as Mr. Hendrickson had moved the Court; that it was not was inescapably prejudicial to him.  The conviction should accordingly be vacated.

### C.     <u>Mr. Hendrickson's Counsel Was Manifestly Ineffective In Rendering Assistance</u>

Finally, a review of the record and events taking place during the trial period establishes the fact that Mr. Hendrickson's chief counsel, the 83-year-old attorney Mark Lane, proved grossly ineffective in the assistance he provided. Mr. Lane was afflicted with a series of medical problems throughout the period of trial, as is shown in the record of the proceedings and the affidavits of witnesses attached. These afflictions unquestionably had a great deal to do with his failure to perform effectively.  Whatever the reason, though, Mr. Hendrickson did not enjoy the effective assistance of counsel that is necessary to ensure a fair trial and that is his right as secured by the United States Constitution.

As the Sixth Circuit Court observes in *Woods v. United States*, 2010 U.S. App. LEXIS 19758 (6th Cir. 2010):

> The starting point for analyzing a claim of ineffective assistance of counsel is the two-pronged standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984). Under that standard, a criminal defendant must show both that his counsel's performance was deficient and that it prejudiced his defense...

In *Strickland*, the Supreme Court defines "deficient performance" as being "below an objective

standard of reasonableness under prevailing professional norms," and clarifies this with:

> That a person who happens to be a lawyer is present at trial alongside the accused is not enough to satisfy the Sixth Amendment; an accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to insure that the trial is fair.

As will be shown below, Mr. Lane's performance in this case was not even within the scope of "prevailing professional norms" under any standard, because the errors he committed were not matters of tactical and strategic choices, but were manifestations of mental confusion rendering him incapable of effective tactical and strategic decision-making. The Strickland court defined "prejudice" as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." In *Franks v. Lindamood,* 2010 U.S. App. LEXIS 19756 (6th Cir. 2010), the Sixth Circuit clarifies "reasonable probability" as a probability "sufficient to undermine confidence in the outcome."

Clearly, an attorney of diminished capacity is incapable of "play[ing] the role necessary to ensure that the trial is fair"; and confidence in the propriety of the outcome of this case is impossible in the face of Mr. Lane's plainly demonstrable errors and exhibitions of diminished capacity. For instance:

1.    Mr. Lane lost track of, and ultimately failed to publish to the jury, numerous key defense exhibits. See the affidavits of Peter Hendrickson and Jack R. Hendrickson, Jr., attached hereto as Exhibits C and D.

2.    Mr. Lane demonstrated repeated fits of confusion during examination.   His inability to comprehend simple time sequences in the following portion of his cross-examination of Shauna Henline is a good example:

> Q:  There did you say that: You read Cracking The Code which was published -- which was written by Peter Hendrickson and published in July of 2003 Cracking The Code.  It was published shortly before the time when employees of the Frivolous Return Program began to observe taxpayers filing Form 1040.  So that would be before, sometime before

July of 2003 you noticed this. Is that right?
A:  I'm not sure I understand your question.
Q:  I beg your pardon?
A:  I'm not sure I understand your question.
Q:  You don't understand. Okay.  I'm going to read to you a paragraph from your declaration which you swore to in United States District Court.  I have read -- I'm going to leave out a website; otherwise, I'm going to read it.
THE WITNESS: Okay.
MR. LANE: I have read Cracking The Code which was written by Peter Eric Hendrickson and published in July of 2003.  Cracking The Code or CTC was published shortly before the time when employees in the Frivolous Return Program at the Ogden, Utah Services Campus began to serve taxpayers filing Form 1040 returns which report zero or no income, which claim using, et cetera. We have the rest. Did you write that?
A:  Yes.
Q:  So you discovered this before July 2003; is that right, that there was a pattern?
A:  No. It was around 2005 that we started seeing this type of filing.
Q:  But didn't you say in your sworn statement that it was shortly before the book was published in 2003?  Isn't that what I just read to you?

(Trial Transcript, pp. 670:18 – 672:10.)  In other instances found in the record:

• He needed the judge's help in laying a foundation for an exhibit he was trying to introduce (see Trial Transcript, pp. 516-520);

• He mistook the extremely significant federal civil lawsuit against the Hendricksons as a Michigan-initiated action, and repeated the same error immediately after being corrected (see Trial Transcript, pp. 553 and 554);

• He was unable to explain the significance of Doreen Hendrickson's 2008 federal refund after introducing it as an exhibit, and then withdrew it in confusion (see Trial Transcript, pp. 556-557);

• He failed to object when prosecutor Leibson violated the Court's ruling on Mr. Hendrickson's Motion *in Limine*, in which the court restricted mention of the civil lawsuit to events through the February 26, 2007 order only. Leibson improperly referred to Mr. Hendrickson "try[ing] to straighten that out anyplace else" and "do[ing] something in reference to this order" so as to take his cross-examination past the bar laid down by the

Court, but Mr. Lane appeared to have forgotten that limit, and said nothing (see Trial Transcript, p. 637);

- He failed to re-direct the only defense witness who ended up taking the stand in the case after an extremely hostile cross-examination, and thereby re-take control over the defense presentation (see Trial Transcript, p. 653);

- He failed to object, before or after, to Judge Rosen's disparaging, prejudicial and burden-shifting questioning of Mr. Hendrickson (see Trial Transcript, pp. 653-657), and then also failed to object when Judge Rosen denied an immediately subsequent jury request to see the words of the law to which Mr. Hendrickson had repeatedly referred in his testimony (see Trial Transcript, pp. 657-658).

Undoubtedly, many other episodes of confusion only took place while Mr. Lane was listening to exchanges in which he did not participate and at other points, all of which apparently hindered his ability to integrate and react to what was going on throughout the proceedings and to successfully maintain a sense of the case and clear method of defense.

For instance, the government put Shauna Henline on the stand as a rebuttal witness for the "limited purpose" of testifying that Mr. Hendrickson's 2002 and 2003 returns did not go through her offices of the IRS "Frivolous Return Program." The reason for her appearance was Mr. Lane's reference in his opening statement to the processing of these returns even though the IRS has programs like Henline's in place by which actually improper filings are identified and interdicted.

Henline testified that Mr. Hendrickson's returns did not go through her program, based on the fact that her office stamps didn't appear on the copies presented by the government as exhibits. The legitimacy of this reasoning is unknown, but is irrelevant, as well, because Mr.

Hendrickson's returns DID get considerable attention from SOMEONE'S "frivolous return program," as is evidenced beyond argument by the IRS having deducted three "frivolous return" penalties from the refund made to Mr. Hendrickson and his wife of amounts withheld during 2003 – each of which deductions are plainly reported on the Department of Treasury Certificates of Assessment for that year.  See government trial exhibits, Nos. 10 and 12.

Further, even while asserting no tax liability, and disputing nothing on their return, the IRS harassed the Hendricksons for several months in 2004 with threats of a "frivolous penalty" in connection with their 2002 filing – including a visit to their home by a local agent; repeated correspondence by mail; and even an aborted effort to seize the penalty amount from them – before then delivering the complete refund the couple claimed for 2003.   In short, Mr. Hendrickson's returns had run the IRS gauntlet, been considerably pawed over, and then were entirely honored – obviously indicating both the propriety of the returns and the truth about the "official view" of those returns, the government's in-trial pretenses to the contrary notwithstanding.

Thus, Mr. Lane had in hand fully documented evidence with which to both easily impeach Henline's testimony, and to make hugely important points for the defense both as to "willfullness" and the real "official" view of Mr. Hendrickson's filings, some of which had already been prepared as exhibits. By the time Henline took the stand, however, Mr. Lane's confusion and inability to maintain a sense of strategy, or even remember the reasons for which he had raised points in his opening statement of just three days prior, caused him to drop this game-winning ball entirely.  He thereby not only failed to neutralize a government assertion and make important points for the defense, but also caused his reference in his opening statement to appear as a floundering, incoherent defense tactic at best, if not an effort to deliberately mislead

the jury.

3.      In addition to his comments about the frivolous return program, Mr. Lane announced in his opening statement that the jury would get to examine Mr. Hendrickson's first book for itself (see Trial Transcript, p. 239); that it would hear from his many witnesses (see Trial Transcript, p. 242); and that it would hear details about complete refunds and other victories won by readers of Mr. Hendrickson's books who had filed returns effectively identical to his, even after considerable IRS attention, and sometimes after agency efforts to discourage the filings.  Mr. Lane particularly referred the jury's attention to tax court records he intended to present concerning a reader whose filings were originally attacked as "frivolous" by the IRS, but were ultimately ruled NOT "frivolous" by the tax court, after an admission and stipulation by a senior IRS attorney (see Trial Transcript, pp. 246, 247).  Lane forgot, and therefore failed to keep, all of these important promises to Mr. Hendrickson's jury.

4.      Mr. Lane's general medical issues included repeated hearing problems (see Trial Transcript, pp. 15, 505, 514, 516, 549, 551 and others) which rendered him ineffective. During *voir dire*, Lane announced his need to exit the court regularly for unexplained medical reasons (see Trial Transcript, p. 21).   These frequent absences inarguably compromised his ability to focus on jury selection or follow the proceedings as they unfolded throughout the trial.

After beginning his examination of Mr. Hendrickson on Thursday, October 23, during which he exhibited a number of the episodes of confusion described above, Mr. Lane was obliged to ask for an early recess because he was experiencing heart palpitations (see Trial Transcript, pp. 560 and 562, and the affidavits attached hereto).

Clearly, Mr. Hendrickson's counsel's performance was deficient.   Clearly, Mr. Hendrickson's defense was prejudiced thereby.

The failure of Mr. Lane to publish defense exhibits to the jury due to an ongoing state of confusion is, by itself, far more than sufficient to "undermine confidence in the outcome."  In addition, however, there were Mr. Lane's in-the-record manifestations of this ongoing confusion and diminished capacity; his more implicit, but just-as-evident failures to make objections at obvious points in the proceedings; and his failure to easily impeach the only witness put on the stand by the government who could actually be questioned about anything related to the "official" demeanor and response to Mr. Hendrickson's filings – a subject <u>heavily</u> (however improperly) deployed by the government in its case.  Then there were his promises made to the jury in his opening statement – all forgotten and unfilled as the trial progressed, making Mr. Hendrickson's defense appear to be floundering, incoherent and desperately made up on the fly. Any one of these in-the-record, inexcusable and manifestly prejudicial deficiencies of performance, and certainly all of them together, demand that Mr. Hendrickson be recognized as having utterly lacked effective assistance of counsel. His conviction should be reversed.

## **PRAYER**

Defendant Peter E. Hendrickson moves this Court to GRANT this motion, VACATE, set aside or correct the conviction and sentence and order his immediate release from prison.

Respectfully submitted this 14th day of April, 2011.


*/s/ Jack R. Hendrickson, Jr.*
Jack R Hendrickson, Jr.
Attorney for Peter E. Hendrickson, Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that this day a true and correct copy of the foregoing

**MOTION OF DEFENDANT PETER E. HENDRICKSON TO VACATE CONVICTION**

**PURSUANT TO 26 U.S.C. §2255**

was filed with the U.S. District Court for the Eastern District of Michigan and served on counsel

for the plaintiff by notification via the Electronic Case Filing system.


Dated:  April 14, 2011                    /s/ *Jack R. Hendrickson, Jr.*
                                          Jack R. Hendrickson, Jr.
                                          Attorney for Defendant